UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPH AMERICA, LLC,<br><br>          Plaintiff,<br><br>v.<br><br>HUAWEI TECHNOLOGIES, CO., LTD., FUTUREWEI TECHNOLOGIES, INC., HUAWEI DEVICE USA, INC.<br><br>          Defendants. | Case No.: 13-CV-2323-CAB-KSC<br><br>**ORDER DISMISSING CASE FOR LACK OF STANDING** |

On December 2, 2016, the Court entered an order requiring Plaintiff SPH America, LLC ("SPH America") to show cause as to why it has standing to bring this lawsuit. Both sides filed written responses to the order, and the Court held a hearing on January 17, 2017. For the reasons set forth below, the Court finds that SPH America does not have standing.

**I. Background**

This is a patent infringement lawsuit in which SPH America alleges that Defendants Huawei Technologies, Co., Ltd., Futurewei Technologies, Inc., and Huawei Device USA, Inc., (collectively Defendants or "Huawei") infringe nine United States Patents, Nos.: RE 40,385; RE 40,253; 5,960,029; 8,121,173; RE 44,507; RE 44,530; 8,565,346; 8,532,231;

1

and 7,443,906.[1] These patents are all owned by the Electronics and Telecommunications Research Institute ("ETRI"), a South Korean research organization. In 2006, ETRI entered into an agreement to license certain patents and their family members to SPH, a Korean-based entity. [Doc. No. 266-2.] On or about February 27, 2007, the license rights were transferred from the Korean-based SPH to plaintiff SPH America. [Doc. No. 266-6 at 3.[2]] The patents at issue in this litigation are subject to the terms of that agreement and its amendments. [Doc. Nos. 266-2; 266-4; 266-6; and 266-8.]

The question of subject matter jurisdiction came to the attention of the Court as a result of a discovery dispute between the parties. The patents at issue were also asserted by SPH America in a related lawsuit against Samsung, Case No. 14-CV-1474-CAB-KSC. Huawei requested documentation between SPH America and Samsung regarding the terms of a license agreement (the "Samsung License") reached in settlement of that litigation. [Doc. No. 244-3.] SPH America responded that ETRI, the owner of the patents, conducted the licensing discussions and that SPH America had no direct email communications with Samsung prior to signing Samsung License. [Id.] SPH America did not provide any documents evidencing that it directed ETRI's negotiations, and the documents provided indicated that ETRI simply sent the final agreement to SPH America for signature when the deal was completed. These circumstances raised concerns about SPH America's true role as a licensee and the intentions of ETRI and SPH America regarding their contractual arrangement.

These concerns were further heightened by a public statement prepared by ETRI's legal department [see Doc. No. 276-3, at 3-4], and issued in 2010 [Doc. No. 262-11], explaining the relationship between ETRI and SPH America. ETRI described SPH America as its litigation agent, acting on ETRI's behalf according to ETRI's will, to

---

[1] On May 13, 2015, the Court entered an order invalidating the '906 patent as indefinite. [Doc. No. 93]. That order is nullified by this subsequent determination that SPH America did not have standing to bring an infringement lawsuit on the patents at issue, including the '906 patent.

[2] Page references of docket entries are to the page numbers assigned by CM/ECF.

enforce ETRI's patents in the United States for a portion of any recovery. In other words, ETRI admitted the arrangement is "effectively [the] grant [of] a 'hunting license,' solely for the purpose of litigation, in the form of a *pro forma* exclusive license." *Prima Tek II, LLC v. A-Roo Co.*, 222 F.3d 1372, 1381 (Fed. Cir. 2000). Such an arrangement would not provide SPH America with standing to sue. Consequently the Court issued an order to show cause ("OSC") to SPH America to demonstrate it has standing.

## II. The Terms of the License Arrangement

In summary, the ETRI-SPH America agreement and its amendments purport to grant an exclusive license to SPH America to use the licensed patents, including to sublicense them to third parties and bring infringement actions. SPH America, however, is obligated use its best efforts to make licensing and litigation decisions that protect the interests of ETRI. SPH bears all the expense of any litigation and is required to pay ETRI between 50% to 70% of any third-party royalties and any litigation proceeds SPH America collects. SPH America has guaranteed minimum payments to ETRI that increase from approximately $268 million per year in 2007, to $896 million per year from 2016 and thereafter.

ETRI retains title to the patents. SPH America cannot transfer any of its rights or obligations under the agreement to a third party without consent of ETRI, and SPH America remains liable to ETRI for the activities of a third party transferee unless those activities are approved by ETRI, but such consent and approval cannot be unreasonably withheld by ETRI. All the license rights revert to ETRI if SPH America breaches the agreement or becomes unable to perform due to bankruptcy, insolvency or any other similar event. Certain of the licensed patents (the WiFi patents) are deemed to be returned to ETRI if SPH America fails to make guaranteed royalty payments.

In light of the rights conveyed to SPH America, the rights retained by ETRI under the agreements, and the conduct of the parties evidencing their intentions surrounding the conveyance, the Court must determine whether SPH America had substantial rights to each

of the patents at issue at the time the complaint was filed to have standing to sue in its own name.

### III. Legal Standards

"Before a court may exercise jurisdiction over a patent infringement action, it must be satisfied that, 'in addition to Article III standing, the plaintiff also possesse[s] standing as defined by § 281 of the Patent Act.'" *Drone Techs., Inc. v. Parrot S.A.*, 838 F.3d 1283, 1292 (Fed. Cir. 2016) (quoting *Alps S., LLC v. Ohio Willow Wood Co.*, 787 F.3d 1379, 1382 (Fed. Cir. 2015)).

Article III standing must be present at the time the suit is brought. *Sicom Sys., Ltd. v. Agilent Techs., Inc.,* 427 F.3d 971 975-76 (Fed. Cir. 2005). If a plaintiff lacks standing at that time, the Court lacks subject matter jurisdiction and the case must be dismissed pursuant to Rule 12(b)(1). The party "bringing the action bears the burden of establishing that it has standing." *Id.* at 976.

The party bringing suit has to have a legally protected interest in the patent created by the Patent Act, so that it would suffer legal injury from an act of infringement, to satisfy Article III standing. *Propat Int'l Corp. v. RPost, Inc.,* 473 F.3d 1187, 1193 (Fed. Cir. 2007). "A party … that has the right to exclude others from making, using, and selling an inventions described in the claims of a patent is constitutionally injured by another entity that makes, uses, or sells the invention." *Intellectual Prop. v. TCI Cablevision*, 248 F.3d 1333, 1346 (Fed. Cir. 2001). Thus, if a party has the exclusive right to decide to license or not to license (i.e., exclude) others from practicing the invention, its interest in the patent can satisfy the requirement for Article III standing. *See Prima Tek II,* 222 F.3d at 1379 (implicit in the right to exclude is the ability to waive that right, i.e., to license activities that would otherwise be excluded.)

However, even a licensee with a legally protected interest in the patent for constitutional standing to sue still may not have sufficient interest in the patent to sue alone in its own name and may need to join the patent owner. *See Propat,* 473 F.3d at 1193. The Court must assess whether a transfer of rights under a patent conveyed "all substantial

rights in the patent to the transferee" and therefore effects a transfer of ownership for standing purposes. *Id.* at 1189. To do so, the Court must "examine whether the agreement transferred all substantial rights to the patent" and "whether the surrounding circumstances indicated an intent to do so." *Asymmetrx, Inc. v. Biocare Medical, LLC,* 582 F.3d 1314, 1319 (Fed Cir. 2009) (*citing Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A,* 944 F.2d 870, 874 (Fed. Cir. 1991)).

Although there is no definitive list of rights that determine whether a patentee has transferred away sufficient rights to render a transferee the owner of a patent for standing purposes, the Federal Circuit has identified certain rights that should be examined:

(1) The exclusive right to make, use, and sell products or services under the patent;
(2) The scope of the transferee's right to sublicense;
(3) The nature of provisions regarding reversion of rights to the transferor;
(4) The right of the transferor to receive a portion of the recovery in infringement suits brought by the transferee;
(5) The duration of the rights granted to the transferee;
(6) The ability of the transferor to supervise and control the transferee's activities;
(7) The obligation of the transferor to continue paying patent maintenance fees; and
(8) The nature of any limits on the transferee's right to assign its interests in the patent.

*See Alfred E. Mann Foun. For Science v. Cochlear Corp.*, 804 F.3d 1354, 1360-61 (Fed. Cir. 2010). Among these, the exclusive right to make, use and sell products or services under the patent "is vitally important to an assignment," while the nature and scope of the right of the transferee to bring suit and any retained right of the transferor to sue is "the most important consideration." *Id.* at 1361.

**IV. Discussion**

    **A. SPH America Lacks Article III Standing**

SPH America's standing with regard to the ETRI patents was challenged in a motion to dismiss in prior litigation, *SPH America LLC v. Acer, Inc. et al*. Civil No. 09cv2525. [Doc. No. 266-9.] In its response to this Court's OSC, SPH America relies heavily on the

5

district court's order in that earlier litigation that SPH America had standing as dispositive of this issue. [Doc. No. 266-10.] Unlike the previous court, however, this Court finds that the requirement that SPH America act in ETRI's best interests is a significant restriction on SPH America's rights. The surrounding circumstances of the transfer of rights, discussed *infra*, indicate that the intent was for ETRI to retain very substantial control over the patents. That intention is expressly described in ETRI's public statement interpreting the contract's "best efforts" restriction and SPH America's role as a licensee in light of that restriction. The license agreement primarily makes SPH America ETRI's litigation agent acting on ETRI's behalf. [Doc. No. 262-11.]

It is undisputed that ETRI is the owner of each of the patents at issue. Title to each patent remains in ETRI's name. ETRI's license agreement gives SPH America an exclusive license to use each of the asserted patents. Defined in that "use" is SPH America's right to make and sell the patented inventions,[3] as well as to sublicense and enforce the patents. This right to use however is not an exclusive right.

First, ETRI retained the right to use the inventions of the patents to prosecute continuation, continuation-in-part, and divisional applications of the licensed patents, in its own name as the owner of the issued patents. *See Asymmetrx,* 582 F.3d at 1320 (retention of the right by the licensor to use the patented inventions to apply for and prosecute further patents is inconsistent with the grant of an exclusive right to practice to invention); *Propat*, 473 F.3d at 1190 (retention of the right to seek new patents on the underlying invention is an implicit retention of the right to use the invention).

---

[3] The agreement provides that SPH America is required to pay ETRI 2.5% of the total proceeds from its manufacture and sale of products using the licensed patents. This provision however is illusory. SPH America does not make or sell any products. SPH America's counsel acknowledged that SPH America is a licensing/litigation entity. [See Doc. No. 283 at 10-11, "SPH's revenue stream is derived entirely – almost entirely from licensing. … So it doesn't have another way to make money other than pursuing action."] ETRI's commercial arrangement with SPH America is essentially the retention of a contingency-based legal counsel company. [Doc. No. 262-11.] SPH America bears all the burden and expense of enforcing ETRI's patents while ETRI gets 50-70% of the proceeds without the inconvenience and risk of protecting its own patents in a foreign forum.

6

13-CV-2323-CAB-KSC

Second, SPH America's rights are significantly encumbered and constrained by its contractual obligation to act in ETRI's best interests coupled with its substantial guarantee of annual payments to ETRI of proceeds from the sublicensing and enforcement of ETRI's patents.[4] With its tremendous annual financial obligation to ETRI for the proceeds from the use of the patented inventions, SPH America cannot realistically choose to exclude any potential sublicensee. *See generally Abbott Laboratories v. Diamedix Corp.*, 47 F.3d 1128, 1132 (Fed. Cir. 1995) (it is not an exclusive right to sue if it is subject to an obligation not to prejudice or impair the patent rights in connection with prosecution or settlement).

ETRI even summarized this relationship as substantially a contingency fee-based agreement with important decisions made per ETRI's will so its rights as patentee are sufficiently protected. [See Doc. No. 262-11 at 4.] *Propat,* 473 F.3d at 1190 (an agreement that gives the licensee the responsibility to license the patent to third parties, to enforce the licensing agreements and to sue infringers in exchange for a defined percentage share of the proceeds of licensing royalties and any judgment or settlement arising out of litigation did not transfer all substantial rights). Indeed, SPH America has little, if any, right to act independently or in its own interests, if those interests diverge from ETRI's. *See id.* at 1191 (retention of a substantial share of the proceeds from commercial exploitation is consistent with the retention of ownership rights in the patent, while allocating to the licensee the duty to provide licensing and enforcement services); *VirnetX, Inc. v. Microsoft Corp.*, No. 6:07 CV 80, 2008 WL 8894682 at *5 (E.D. Tex. Jun. 4, 2008) (35% right to net litigation proceeds and the obligation to protect that equity interest did not support an exclusive right to sue).

The Court is not persuaded by the argument that SPH America and ETRI necessarily have common interests so the economic reality of this restraint on SPH America's ability

---

[4] It cannot reasonably be argued that it was ever the intention or expectation of the parties that the payment guarantees would be met in whole or in part by SPH America selling products. SPH America's license rights can be terminated if it does not meet its guaranteed payments, and it can only make those payments by licensing and enforcing the patents on behalf of ETRI.

7

to act independently is inconsequential. Although ETRI has given SPH America the right to select targets for licenses and litigation, the agreement requires SPH America to do so in ETRI's best interests protecting the significant equity interest ETRI reserved to itself. Such rights to sue and grant licenses may accord SPH America "broad authority to act as [ETRI's] agent for purposes of licensing and litigation" but does not transfer substantial rights to the patents. *Propat*, 473 F.3d at 1192; *Prima Tek II,* 222 F.3d at 1379 (Fed. Cir. 2000) (a license to license falls short of transferring all substantial rights to the patents). Moreover, ETRI may want SPH America to pursue an infringer for royalties, but the cost of such litigation (borne solely by SPH America) may outweigh any benefit to SPH America. Pursuant to the license agreement, however, it would be a breach for SPH America to decline to pursue litigation based on costs that would be born entirely by SPH America.[5]

That SPH America does not actually have substantial rights in the patents is reflected in ETRI's retention of control of licensing decisions with respect to the settlement of the lawsuit SPH America filed against Samsung. ETRI, not SPH America, negotiated the Samsung License, which included the patents purportedly exclusively held by SPH America, without evidence of any direction or input from SPH America. An email communication from ETRI to Samsung attaches a term sheet "reflecting the discussion exchanged so far between the two organizations."[6] What it also reflects is that SPH America is not included in the communication.

The term sheet with Samsung stated that it covered patents "ETRI (including exclusive licensees or licensing agencies of ETRI) may assign the license to a third party,"

---

[5] The agreement provides that SPH America controls litigation decisions at SPH America's sole expense, for a portion of any litigation recovery. Such decisions while left to SPH America, must protect ETRI's interests. The intention, as unequivocally stated by ETRI, was to license SPH America, an "expert legal counsel company," because it has the experience to manage litigation to protect ETRI's rights as the patentee in legal proceedings. [Doc. No. 244-2, at 4.]

[6] This document produced to the Defendants by SPH America, was submitted to the Court during the oral argument and subsequently filed under seal. [Hrg. Transcript, Doc. No. 283 at 17-20; Doc. No. 286.]

indicating ETRI is licensing patents to which SPH America claims exclusive control. The term sheet furthers stated that Samsung must make a separate agreement with SPH America for certain patents (the 3G patents)[7] at an amount specified by ETRI. Nothing about this communication suggests that ETRI was acting simply as a conduit on SPH America's behalf to relay terms set by SPH America to Samsung. To the contrary, it corroborates SPH America's discovery response that ETRI negotiated the license to the patents purportedly held by SPH America. [Doc. No. 244-3.]

In sum, SPH American cannot act in a manner contrary to ETRI's interests without being subject to a breach of contract claim and loss of the license arrangement. *See Propat*, 473 F.3d at 1192 (patent owner's right to terminate the licensee's rights to the patents if it fails to perform up to the specified benchmarks is an indication of retention of significant ownership interest in the patent). Thus, although ETRI has made SPH America its agent for licensing and litigation, ETRI has not transferred substantial ownership of the patents to SPH America. *Id.* ("A patent owner may give another responsibility to select targets for suit – a power of attorney, in effect – without surrendering ownership of the patent. The same principle applies to [the] right to select licensees. While the rights to sue and grant licenses accord … broad authority to act as the [patentee's] agent for purposes of licensing and litigation, they do not transfer ownership."). As a result, SPH America lacks Article III standing to sue for infringement.

> **B. Because SPH America Lacks Article III Standing, Joinder of ETRI Would Be Futile**

SPH America argued should the Court find it does not have standing to sue alone, it be allowed join ETRI in the litigation to correct that deficiency. "[A]n exclusive licensee

---

[7] Notably, the term sheet did not indicate that a separate agreement with SPH America must be entered for the WiFi Patents ('346 patent and '231 patent). These are the patents that were subject to being "deemed to have been returned" to ETRI if SPH America failed to make annual guaranteed royalty payments. [Doc No. 266-6 at 5.] It is undisputed SPH America has not met the guaranteed payments. The term sheet prepared by ETRI supports the conclusion that it deems those patents returned and no longer subject to the requirement of even a *pro forma* separate agreement with SPH America for ETRI to license them.

having fewer than all substantial patent rights (that is not subject to an exception) that seeks to enforce its rights in a patent generally must sue jointly with the patent owner. *Intellectual Prop.*, 248 F.3d at 1347–48. In this case, however, despite the labels used by SPH America and ETRI, SPH America is not an exclusive licensee. SPH America is merely ETRI's agent to enter into licenses and litigate on ETRI's behalf. SPH America does not have an exclusive license to any patent rights because: (1) SPH America is required to act to protect ETRI's interests; (2) ETRI retained title to the patents; (3) ETRI retained use of the inventions to further its portfolio; (4) ETRI has the dominant equity interest in the proceeds of the inventions; and (5) ETRI controls licensing negotiations. ETRI's grant of a "hunting license" is not a proprietary interest or exclusive license in the patents. Because SPH America does not have a proprietary interest in the patents, it does not suffer any injury in fact fairly traceable to infringement of the patents. *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). SPH America, therefore, lacks Article III standing meaning it cannot even be a co-plaintiff in an infringement action under the ETRI patents. Accordingly, SPH America's request it be permitted to amend to add the patent owner and continue the action is denied.

V. **Conclusion**

In light of the foregoing, the Court finds that SPH America has not satisfied its burden to establish standing to bring this lawsuit. Accordingly, the lawsuit is **DISMISSED** for lack of Article III standing.[8]

It is **SO ORDERED.**

Dated: April 10, 2017

_____
Hon. Cathy Ann Bencivengo
United States District Judge

---

[8] In light of this decision, Huawei's motion for summary judgment [Doc. No. 259] is **DENIED AS MOOT**.